STATE *ex rel.* PHYLLIS HUFF ARNOLD, *Commr., etc.*

*and*

STATE *ex rel.* FDIC

*v.*

THE HON. L. D. EGNOR, JR.

(No. 15086)

Decided February 10, 1981.

*Denny & Caldwell, P. Thomas Denny and Susan Cannon-Ryan, Campbell, Woods, Bagley, Emerson, McNeer*

& Herndon, E. M. Kowal, Jr. and Milton T. Herndon, for relators.

MILLER, JUSTICE:

In this original proceeding in prohibition, the Commissioner of Banking of the State of West Virginia (Banking Commissioner) and the Federal Deposit Insurance Corporation (FDIC), as state receiver of the Metro Bank of Huntington, Inc., (Metro Bank) contend that the Circuit Court had no jurisdiction to enter its order of December 12, 1980. This order set a hearing and directed the petitioners to appear before the court and answer certain issues raised in a report prepared by a court-appointed Commissioner. This Commissioner had questioned the way in which the FDIC was administering the Metro Bank's receivership.[1]

The petitioners take the position that our earlier cases, *Charter v. Kump*, 109 W. Va. 33, 152 S.E. 780 (1930), and *Picklesimer v. Morris*, 101 W. Va. 127, 132 S.E. 372 (1926), which dealt with the Banking Commissioner's powers under W. Va. Code, Chapter 34, Section 81(a)(7) (1925),[2] preclude the Circuit Court from exercising jurisdiction over the administration of the Metro Bank by the receiver, FDIC. Additionally, petitioners contend that absent exhaustion of administrative remedies under *Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W. Va. 245, 183 S.E.2d 692 (1971), judicial intervention is not warranted.

The respondent judge asserts that once petitioners invoked his jurisdiction to approve the transfer of assets of the Metro Bank, he had jurisdiction to inquire into the subsequent activities of the receiver.

The factual background may be briefly summarized. The Metro Bank is a state-chartered bank that experienced considerable financial difficulty. This led to an investiga-

---

[1] The original papers filed before the trial court were filed only on behalf of the FDIC. However, the Banking Commissioner appeared at the initial hearing and agreed to have party status.

[2] The current provision, W. Va. Code, 31A-7-2, is substantially similar to the provision dealt with in *Charter* and *Picklesimer*.

tion of its financial condition by the Banking Commissioner and the FDIC. The investigation culminated in an order by the Board of Banking and Financial Institutions (Board) under W. Va. Code, 31A-3-3(e), that extraordinary circumstances existed which required immediate action.[3] Among the Board's findings was "[t]hat a recent financial analysis attached hereto as Exhibit A shows that Bank is insolvent."

The Board ordered that the withdrawal of deposits be prohibited after the close of business on September 12, 1980, pursuant to its powers under W. Va. Code, 31A-3-2(b)(1).[4] It also authorized the Banking Commissioner, if deemed necessary, to appoint a receiver for the Metro Bank under W. Va. Code, 31A-7-2.[5]

It appears from the record that the precarious condition of the Metro Bank was known for some period of time since the FDIC, with the approval of the Banking Commissioner,

---

[3] W. Va. Code, 31A-3-3(e), provides:

"Whenever the board shall find that extraordinary circumstances exist which require immediate action, it may forthwith without notice or hearing enter an order taking any action permitted by subdivisions (1), (2), (4) and (5) of subsection (b), section two [§ 31A-3-2] of this article. Immediately upon the entry of such order, certified copies therefore shall be served upon all persons affected thereby and upon demand such persons shall be entitled to a hearing thereon at the earliest practicable time."

[4] W. Va. Code, 31A-3-2(b)(1), provides:

"(b) The board shall further have the power, by entering appropriate orders, to:

(1) Restrict the withdrawal of deposits from any financial institution when in the judgment of the board extraordinary circumstances make such restrictions necessary for the protection of creditors of and depositors in the affected institution;"

[5] The pertinent portion of W. Va. Code, 31A-7-2, is:

"If the Commissioner of banking shall ascertain from any source that the capital of any financial institution is substantially impaired, and any such institution, upon notice from him, does not promptly make good such impairment, or if the commissioner shall ascertain from any source that any such financial institution is insolvent, he shall have authority to appoint an employee of the department or banking receiver thereof to take charge of the papers, books, records, moneys and assets of every description of such institution; . . ."

had let bids on the Metro Bank and arranged to enter into a written Purchase and Assumption Agreement with a newly chartered national bank, Heritage National Bank (Heritage). The purpose of the agreement was to have the FDIC as state receiver transfer the assets and deposit liabilities of the Metro Bank to Heritage. In addition, the FDIC and Heritage executed an Indemnity Agreement. The FDIC's authority to make these agreements is found in 12 U.S.C. §1823 and is not challenged in this proceeding. It also appears that the FDIC as a state receiver retained control over certain other assets and liabilities of the Metro Bank which it planned to liquidate.

Under 12 U.S.C. §1823(d), there is a requirement that, if the FDIC sells assets of a state bank or makes loans in connection with the purchase of such assets, it must obtain "the approval of a court of competent jurisdiction."[6] It was this statutory provision that caused the FDIC to petition the Circuit Court of Cabell County to obtain the court's approval of the various agreements surrounding the sale of the Metro Bank's assets to the newly created Heritage National Bank.

The petition for approval was filed September 12, 1980, a Friday, and it is obvious that there was a great deal of urgency in the situation as evidenced by the testimony of the Banking Commissioner. Immediate approval of the transaction was sought so that the new bank could open on Monday, September 15, 1980. This would provide continuity for the Metro Bank's business and hopefully maintain the confidence of the depositors of the Metro Bank whose accounts were transferred to the new bank.

The respondent trial judge was not only confronted with this emergency but also had several lawyers who appeared

---

[6] The pertinent portion of 12 U.S.C. §1823(d) is:

"The Corporation, in its discretion, may make loans on the security of or may purchase and liquidate or sell any part of the assets of an insured bank which is now or may hereafter be closed on account of inability to meet the demands of its depositors, but in any case in which the Corporation is acting as receiver of a closed insured bank, no such loan or purchase shall be made without the approval of a court of competent jurisdiction."

to complain about the sale. All of the attorneys conceded that they had little law to guide the court. The trial court, after hearing testimony concerning the insolvency of the Metro Bank, the details relating to the appointment of the FDIC as its receiver by the Banking Commissioner under W. Va. Code, 31A-7-2, and its arrangements to sell the assets of the Metro Bank to Heritage, approved the sale.

In its order approving the sale, the court appointed a Commissioner "for the purpose of obtaining for this Court a report from the parties hereto, within 60 days, on all matters the Commissioner may deem necessary to protect the best interests of the public, the stockholders, the depositors and other creditors of the Metro Bank of Huntington, Inc., and to keep this Court advised as to all matters in issue among said parties."[7]

The court-appointed commissioner filed a report with the court on December 12, 1980, that resulted in the court's ordering the petitioners to appear for a hearing and gave rise to this original proceeding in prohibition. The Commissioner's report contained five general grounds which the court was asked to review: (1) the principals in the old Metro Bank and the receiver disagreed as to the value of certain assets of the Metro Bank; (2) there were third parties who wished to purchase certain property on which the Metro Bank had security interests and although they were willing to pay the total lien indebtedness, the receiver had not acted; (3) the receiver was acting in a peremptory fashion in collecting on the accounts owed Metro Bank including debts owned by its principal officers; (4) the receiver was employing too many persons and incurring too many legal costs all of which created

---

[7] No objection was made to the Commissioner's appointment and it would appear that the court conceived the Commissioner's role to be that of keeping the court abreast of the situation:

"THE COURT: I realized before, Mr. Underwood, the limitations of this Court in the circumstances, but given the rather peculiar set of circumstances under which you need our help, and we have to protect the public. I would like to be kept abreast of what's happening."

unnecessary expenses; and (5) there was a question as to directors' and officers' liability insurance coverage.

The threshold inquiry is whether the requirement in 12 U.S.C. §1823(d), that a court of competent jurisdiction approve the transfer of assets, expands the jurisdiction of our state court beyond what is provided in our state bank liquidation statutes. W. Va. Code, 31A-7-1, *et seq.*

## I.

### *THE CIRCUIT COURT'S JURISDICTION UNDER FEDERAL STATUTES*

We observe that under 12 U.S.C. §1819, where the FDIC "is a party in its capacity as a receiver of a State bank and which [suit] involves only the rights or obligations of depositors, creditors, stockholders [of] such State Bank under State law [such suit] shall not be deemed to arise under the laws of the United States." Thus, where, as here, the FDIC is a party in its capacity as "a receiver of a State bank," there is an explicit statutory recognition that, where the litigation involves rights of creditors, depositors and stockholders, the substantive law of the State is applicable on receivership matters and not federal law. *FDIC v. Sumner Financial Corp.*, 602 F.2d 670 (5th Cir. 1979); *Freeling v. Sebring*, 296 F.2d 244 (10th Cir. 1961); *FDIC v. Ashley*, 408 F. Supp. 591 (D.C. Mich. 1976).

We have not found any case where a court has construed 12 U.S.C. §1823(d) in the context of what type of hearing is required before court approval can be obtained.[8] Nor have

---

[8] The majority of cases discussing this area arise on a claim that the FDIC as receiver transferred or sold the assets *ex parte* without a full judicial hearing. Most courts have concluded that a full hearing is not warranted because of the special and delicate problems involved in bank closings. *Cf. Fahey v. Mallonee*, 332 U.S. 245, 253, 91 L.Ed. 2030, 2039, 67 S.Ct. 1552, 1556 (1947); *Greater Delaware Valley Federal v. Federal Home Loan Bank Board*, 262 F.2d 371, 373 (3rd Cir. 1958); *Roslindale Co-Op Bank v. Greenwald*, 481 F.Supp. 749, 753-54 (D.C. Mass. 1979), *aff'd*, 627 F.2d 1087 (1st Cir. 1980); *FDIC v. American Bank Trust Shares*, 460 F. Supp. 549, 558-59 (D.C. S.C. 1978); *In re Franklin National Bank*, 381 F. Supp. 1390, 1391-93 (D.C. N.Y. 1974). In the

we found any case where a state court has construed the court-approval provision of 12 U.S.C. §1823(d) as it relates to its own state bank liquidation statute. There also does not appear to be any congressional legislative history in regard to this particular provision.[9]

The same paucity of authority exists as to a case where the court-approval provision of 12 U.S.C. §1823(d) has been construed to broaden a state court's jurisdiction in regard to a state bank liquidation. As noted above, 12 U.S.C. §1819 recognizes that where the FDIC acts as a state receiver, its action in the receivership is tested by the state banking law. Logic would seem to dictate that there is a difference in the issues involved between court approval under a §1823(d) transfer and the more complex administrative problems relating to the liquidation of assets in a state receivership. The latter must obviously be done under state law and this may well account for the recognition in 12 U.S.C. §1819 of state law supremacy in this area.

We, therefore, conclude that the provisions of 12 U.S.C. §1823(d), requiring approval of a court of competent jurisdiction, when read in light of 12 U.S.C. §1819, cannot be found to create any additional jurisdiction in a state court to supervise a state bank receiver other than what is conferred on the court under our state bank liquidation statutes. W. Va. Code, 31A-7-1, *et seq.*

## II.

### *THE CIRCUIT COURT'S JURISDICTION UNDER STATE LAW*

It is true that the initial petition filed by the FDIC, besides relying on 12 U.S.C. §1823(d), indicated that the trial court had jurisdiction under W. Va. Code, 31A-7-4, to

present case, there is no issue raised as to the trial court's handling of the hearing and its order approving the transfer of assets.

[9] The FDIC Act as amended is discussed in some detail in the House Report but no comment is made on the purpose of the court approval provision. H.R. Rep. No. 2564, 81st Cong., 1st Sess., reprinted in [1950] U.S. Code Cong. Ser. 3765.

approve the transfer of assets.[10] We believe that reliance on this statute is inappropriate. While it may be somewhat inartfully drawn, this statute is designed to cover two situations involving the sale or transfer of assets. The first is where the state receiver has been appointed by the Banking Commissioner and is not a party to a court proceeding. In this situation, the receiver may sell or transfer assets with the written consent of the Banking Commissioner.

The second situation occurs when the receiver is a party to a court proceeding, in that event the court must approve the sale or transfer in addition to the Banking Commissioner. The court proceeding referred to in W. Va. Code,

---

[10] W. Va. Code, 31A-7-4, relates generally to the state receiver's power to borrow money from federal agencies. Its relevant provisions with regard to the appropriate approval for such borrowing are:

"Any receiver of a banking institution, heretofore or hereafter appointed under the provisions of this chapter, if there be no proceeding instituted as authorized by law by such receiver in any court in this State against such banking institution and its stockholders, with the consent in writing of the commissioner of banking, and if there be a proceeding instituted as authorized by law by such receiver in any court in this State against such banking institution and its stockholders, with the consent in writing of the commissioner of banking and the approval of the court, and any receiver of a banking institution heretofore or hereafter appointed by any court in this State in connection with any proceeding in such court against such banking institution, with the consent in writing of the commissioner of banking and the approval of the court, is hereby authorized and empowered to borrow money from and contract for loans with any federal finance or lending agency, created and existing under any act of the Congress of the United States, . . ."

In this respect, W. Va. Code, 31A-7-5, giving power to the receiver to sell or merge the assets an insolvent state bank, contains a parallel provision permitting the receiver to do this with the consent of the Banking commissioner:

"In any voluntary or compulsory proceeding to liquidate a state banking institution, such banking institution, if the proceeding be not in court, with the consent in writing of the commissioner of banking, and if the proceeding be in court with the consent in writing of the commissioner of banking and the approval of the court, may reorganize, reclaim possession of its assets, and continue in business."

31A-7-4, must be read in context with the other related sections in W. Va. Code, 31A-7-1, *et seq.*, and in particular, W. Va. Code, 31A-7-2, which permits a state banking receiver to institute a proceeding in court to ascertain creditors, depositors and the amounts and priorities of their claims.[11]

The approval to transfer the assets of the old Metro Bank to Heritage was given by the Banking Commissioner under authority contained in W. Va. Code, 31A-7-4. At the time this approval was given, the State bank receiver had instituted no action under W. Va. Code, 31A-7-2, nor was the receiver involved as a party in any other state court proceeding. We do not believe, under these circumstances, that W. Va. Code, 31A-7-4, requires court approval prior to the transfer.

While there has been some changes to W. Va. Code, 31A-7-1, *et seq.*, since our cases dealing with bank closings during the 1920's and 1930's, *Timmons v. People's Trust Co.*, 114 W. Va. 618, 173 S.E. 79 (1934); *Charter v. Kump*, 109 W. Va. 33, 152 S.E. 780 (1932); *Picklesimer v. Morris*, 101 W. Va. 127, 132 S.E. 372 (1926),[12] these changes are not relevant to the present case except on the exhaustion of administrative remedies question which we will discuss later.

In *Picklesimer*, *Charter*, *Timmons* and related cases, we have consistently held that the primary jurisdiction for the administration of an insolvent state bank is with the Banking Commissioner under our bank liquidation statutes and that the receiver appointed by the Banking Commissioner is ordinarily not subject to the jurisdiction of a court. In *Timmons*, this Court construed the

---

[11] W. Va. Code, 31A-7-2, in pertinent part, provides:

"In connection with the administration of the assets of any such institution, any such receiver may bring an action in the circuit court of the county where such institution is located, to ascertain the several depositors and creditors of such institution and the amounts and priorities of their respective claims."

[12] As an illustration of one of the changes, in 1935 W. Va. Code, 31A-7-7, was enacted, empowering the FDIC to act as a state receiver and certain procedural powers were given to it, none of which are germane to the present issue.

forerunner to W. Va. Code, 31A-7-2, regarding the Banking Commission's powers, and stated in Syllabus Point 5:

"Under Code 1931, 31-8-32, [now W. Va. Code, 31A-7-1, *et seq.*] the commissioner of banking has exclusive authority to administer the assets of an insolvent bank."

Similar language can be found in Syllabus Point 1 of *Charter* and Syllabus Point 3 and 4 of *Picklesimer*. The reason for this rule is the same advanced by the federal courts and discussed in Note 8, *supra*,[13] a recognition that the urgent and delicate issues involved in a bank closure, affecting as they do not only large sums of money, but the credit and assets of its depositors, both large and small, are all matters which are ill suited for lengthy court hearings. In *Pickelsimer*, the Court made this observation about our bank liquidation statutes:

"Before enactment of this law, the process of liquidation of insolvent banks through the instrumentalities of the courts had been extended over many years, engendering public complaint and criticism. An expeditious, inexpensive and efficient method was needed, and the Legislature met the need, following the footsteps of other states and the federal government." 101 W. Va. at 133, 132 S.E. at 314.

There can be little doubt that under *Timmons*, *Charter* and *Picklesimer* we have held that our bank liquidation statutes place exclusive jurisdiction in the Banking Commissioner for appointing and supervising the bank receiver. Certainly, the plain language of W. Va. Code, 31A-7-2, as well as Section 4 and 5,[14] vest broad powers in

---

[13] *Fahey v. Mallonee*, 332 U.S. 245, 253, 91 L.Ed. 2030, 2039, 67 S.Ct. 1552, 1556 (1947), contains this statement:

"It is complained that these regulations provide for hearing after the conservator takes possession instead of before. This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in this summary manner."

[14] See Note 10, *supra*.

the receiver, which powers are to be exercised with the consent of the Banking Commissioner. The only time court approval is needed under our statutes is when the state receiver is a party to some existing suit in state court. Since no such case was pending, approval was not required under our state statutes.

## III.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

It is true that both *Charter v. Kump*, 109 W. Va. 33, 152 S.E. 780 (1932), and *Picklesimer v. Morris*, 101 W. Va. 127, 132 S.E. 372 (1926), recognize that a suit may be brought against the statutory receiver if it is shown that he is engaged in fraud or a serious breach of his statutory duties. In Syllabus Point 1 of *Charter* the exception permitting a court to assume jurisdiction is stated as "a full showing that the plaintiff will suffer loss through the neglect, incompetence or fraud of the receiver or commissioner if they are permitted to remain in exclusive control."

However, petitioners argue that this exception is no longer valid since both *Charter* and *Picklesimer* were decided under a prior banking statute that did not provide any administrative review. In 1969, the Legislature enacted W. Va. Code, 31A-8-1, *et seq.*, which provided an administrative review of the Banking Commissioner's orders. We believe that the establishment of an administrative remedy does modify the exceptions created in *Charter* and *Picklesimer* since "[t]he general rule is that where an administrative remedy is provided by statute or by rules and regulations having the force and effect of law, relief must be sought from the administrative body, and such remedy must be exhausted before the courts will act." Syllabus Point 2, *Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W. Va. 245, 183 S.E.2d 692 (1971); *Daurelle v. Traders Federal Savings & Loan Association*, 143 W. Va. 674, 104 S.E.2d 320 (1958); and *State ex rel. Burchett v. Taylor*, 150 W. Va. 702, 149 S.E.2d 234 (1966). There are exceptions to this general rule of exhaustion of administrative remedies such as lack of agency jurisdiction or the constitutionality of the underlying agency statute. 3 K.

Davis, Administrative Law Treatise §§20.01-20.10; 2 Am. Jur.2d *Administrative Law* §§602-606. Other than one possibility,[15] none of the exceptions contained in Syllabus Point 1 of *Charter, supra,* come within the type of claims which will avoid the requirement of exhausting administrative remedies.

The critical point of this case is that neither 12 U.S.C. §1823(d) nor our state bank liquidation statute conferred jurisdiction on the trial court to control the actions of the FDIC acting as a state receiver for Metro Bank. In consequence, the court was without jurisdiction to enter its order of December 12, 1980, requiring petitioners to appear before it to answer the allegations filed by the court-appointed Commissioner. Our law is settled that a writ of prohibition will lie where the trial court does not have jurisdiction or, having jurisdiction, exceeds its legitimate powers. Syllabus Point 3, *State ex rel. McCartney v. Nuzum,* 161 W. Va. 740, 248 S.E.2d 318 (1978); *State ex rel. Scott v. Taylor,* 152 W. Va. 151, 160 S.E.2d 146 (1968).

For the foregoing reasons, a writ of prohibition is issued against the respondent prohibiting him from further enforcing his order of December 12, 1980.

*Writ Awarded*

---

[15] It is possible that if specific allegations of fraud were claimed as against the state banking receiver which would result in irreparable harm to a party, who had standing to bring such action against the state receiver, exhaustion of administrative remedies might not be required. In this case, no such claims are made nor does the court-appointed Commissioner have such standing.